AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Massachusetts

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Steven Berman | )   Case No. 11-MJ-6167-LTS |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___7/13/11-9/8/11___ in the county of ___Middlesex___ in the
_____ District of ___Massachusetts___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 2 | Wire Fraud (attempt) |
| 18 U.S.C. §§ 1341, 2 | Mail Fraud (attempt) |

This criminal complaint is based on these facts:

Please see attached Exhibit A (Affidavit of Chris Gianakura)

✓ Continued on the attached sheet.

_____
*Complainant's signature*

Chris Gianakura, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   __11/30/2011__

_____
*Judge's signature*

City and state:   __Boston, MA__

Hon. Leo T. Sorokin, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF CHRIS GIANAKURA

I, Chris Gianakura, being duly sworn, hereby depose and state as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Economic Crime Squad of the Boston Division. I have been employed with the FBI for over seven years. My primary duties, as a member of the Economic Crimes Squad, are to investigate financial crimes and various fraudulent schemes. As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

2.     Through my experience, I have conducted numerous investigations and am familiar with various criminal statutes. I have investigated multiple federal criminal acts pertaining to counter terrorism and financial crimes. My background consists of a bachelor's degree in finance with a minor in criminology. I have also taken training and seminars that focused on financial crimes.

3.     I am familiar with the provisions of Title 18 of the United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), and 1349 (attempt and conspiracy for federal fraud offenses).

4.     I make this affidavit in support of a criminal complaint charging the following individuals with the offenses enumerated below:

| Name | Offense(s) |
|------|-----------|
| James Prange ("PRANGE") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2. |
| Karen Person | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail |

| ("PERSON") | fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
|---|---|
| Steven Berman ("BERMAN") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
| Richard Kranitz ("KRANITZ") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
| John C. Jordan ("JORDAN") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
| Kelly Black-White ("BLACK-WHITE") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2. |
| Stephen Stuart ("STUART") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
| Albert Reda ("REDA") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |
| Muhammad "M.J." Shaheed ("SHAHEED") | Wire fraud (attempt) in violation of 18 U.S.C. §§ 1343, 1349, 2; Mail fraud (attempt) in violation of 18 U.S.C. §§ 1341, 2. |

5.     The facts stated herein are based on my own personal involvement with this investigation, as well as my review of documents and information provided by others assisting in this investigation and by witnesses.  In submitting this affidavit, I have not included each and every fact known to me about this investigation.  Rather, I have only submitted those facts which I believe are sufficient to establish probable cause.

## BACKGROUND

6.     All of the charges in the complaints arise from an FBI-run "sting" operation conducted from October 2010 through at least September 2011.

7.     UA is an undercover FBI agent who purported to be a representative of a New York-based investment fund (the "Fund").  The Fund purportedly had a satellite office in a

suburb of Boston, Massachusetts, out of which UA periodically worked (the "Boston Office"). In actuality, the Fund never existed, except as part of the ongoing FBI undercover operation.

8.      From October 2010 through at least August 2011, UA met with approximately 30 individuals at the Boston Office to discuss potential investment of the Fund's monies. These meetings were surreptitiously recorded; UA knew of, and consented to, the recording. UA generally represented to these individuals that he had investment discretion over a portion of the Fund's monies. UA further generally represented to these individuals that he was willing to invest Fund monies in exchange for a kickback to him of fifty percent of the investment monies—a kickback that the Fund knew nothing of. In effect, UA generally represented that he was willing to enter into agreements with individuals whereby UA would secretly pocket one-half of the monies that he invested on the Fund's behalf.

9.      The individuals who met with UA fall into two general groupings. The first grouping consists of individuals who agreed to find and introduce to UA—in exchange for a portion of UA's kickback money—publicly traded companies that would agree to pay the kickback in exchange for funding (the "Finders"). The second grouping consists of executives of publicly traded companies who agreed to pay kickbacks to UA in exchange for an investment of Fund monies in their companies (the "Executives").

10.      In his meetings with both Finders and Executives, UA generally outlined how the investment arrangement would work. UA generally explained that he would use Fund monies to invest in a given company. UA generally described that he was willing to invest up to $5 million in a given company, of which $2.5 million would be secretly kicked back to him. In most instances, the proposed investment consisted of a purchase of company stock, in which UA

3

agreed with the Executives to pay more for the stock than the stock's current price on the open market. UA generally represented that his investment would not be made all at once, but would rather be made over a period of months in escalating amounts, which UA generally called "tranches" (or installments). UA usually stated that the tranches would start in small amounts, approximately in the range of $10,000 to $20,000, and would increase over time.

11.     With respect to the kickbacks, UA generally arranged for the kickback amounts to be sent to what he usually called a "nominee company"—a sham consulting company which he controlled. UA generally told Finders and Executives that the Fund was not aware of the kickback that his "nominee company" was to receive with every investment. UA agreed with various Finders that they would receive a portion of the amounts kicked back to UA by companies that they introduced to him.

12.     In general, Executives delivered the stock certificates resulting from UA's investment of Fund monies in their company by sending them to him via the United States mails or by private or commercial interstate carrier. In general, the transfer of funds for investment in a given company, as well as the payments of kickbacks returned to UA by the Executives and the further payment of a portion of the kickbacks to Finders, were all effected by wire transfer.

## FINDERS AND EXECUTIVES

### FINDERS

13.     The following individuals acted as Finders who, as described above, introduced companies to UA for a prospective investment of Fund monies, followed by a kickback to UA:

A.     PRANGE operates Northern Equity, Inc., and is in the business of promoting penny stocks and assisting public companies in finding sources of funding.

4

B.     BLACK-WHITE operates Premier Media Services, Inc. and Premier Funding, Inc., and is in the business of promoting penny stocks and assisting public companies in finding sources of funding.

C.     CW is a cooperating witness who is in the business of promoting penny stocks and assisting public companies in finding sources of funding. CW has entered into a plea agreement with the United States Attorney's Office which contemplates his pleading guilty to one count of wire fraud (attempt), in violation of 18 U.S.C. §§ 1343, 1349, and 2, for his participation in the scheme to defraud described herein. The agreement contemplates that CW may be eligible to receive a "substantial assistance" departure in his advisory Sentencing Guidelines calculation.

EXECUTIVES

14.    The following individuals are Executives who, as described above, agreed to secretly kick back to UA fifty percent of the Fund monies he invested in their company.

A.     PERSON is the Chief Executive Officer ("CEO"), President and Chairman of the Small Business Company, Inc. ("SBCO"), a company which purports to assist small businesses in achieving growth. SBCO also conducts business under the name Select Business and Corporation Opportunities, Inc. SBCO's common stock is publicly quoted on the Pink OTC Markets, Inc., an inter-dealer electronic quotation and trading system in the over-the-counter securities market which is commonly referred to as the "Pink Sheets" (the "Pink Sheets").

B.     BERMAN is the CEO and President of China WI-Max, Communications, Inc. ("China WI-Max"), which is a communications company. China WI-Max's common stock is publicly quoted on the Pink Sheets.

5

C.   KRANITZ is an attorney and a member of the Board of Directors of China WI-Max.

D.   JORDAN is the CEO, President, Chief Financial Officer, Chief Accounting Officer and a member of the Board of Directors of Vida Life International, Ltd. ("Vida Life"). Vida Life is in the business of developing and selling animal nutrition products. Vida Life's common stock is publicly quoted on the Pink Sheets.

E.   STUART is a major shareholder of ComCam International, Inc. ("ComCam"). ComCam is in the business of developing and marketing video-surveillance cameras and related equipment and networking services. ComCam's common stock is publicly quoted on the Pink Sheets.

F.   REDA is Treasurer and a member of the Board of Directors of 1st Global Financial ("1st Global"), which is in the real estate business. 1st Global's common stock is publicly quoted on the Pink Sheets.

G.   SHAHEED is the President, CEO and Chairman of Augrid Global Holdings Corporation ("Augrid"), a holding company which seeks to acquire private companies in a variety of industries. Augrid's common stock is publicly quoted on the Pink Sheets.

## THE FRAUDULENT SCHEME

*JAMES PRANGE*

### SCHEME TO DEFRAUD

15.   Beginning in or about July 2011 through at least September 6, 2011 PRANGE engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by agreeing to introduce Executives to UA who could enter into the funding/kickback arrangement

described above.  PRANGE and UA agreed that for each such arrangement, PRANGE would receive a portion of the kickback.

## MANNER AND MEANS OF THE FRAUD

16.     On or about July 22, 2011, UA met with PRANGE and CW in the Boston Office (the "July 22 PRANGE Meeting").  The July 22 PRANGE Meeting was recorded.

17.     At the July 22 PRANGE Meeting, UA represented to PRANGE that UA had access to Fund monies which he could invest in companies.  UA represented to PRANGE that UA would only invest in the companies in exchange for a kickback of fifty percent of the investment monies—a kickback that the Fund knew nothing of.  UA informed PRANGE that this kickback arrangement would exist in derogation of UA's fiduciary duty to the Fund and its investors.  UA and PRANGE entered into an agreement that PRANGE would steer companies to UA for potential investment of his Fund's monies.  In exchange, UA and PRANGE agreed that PRANGE would receive a percentage of the monies that the executives kicked back to UA.  By way of example, UA told PRANGE that if UA invested $5 million of Fund monies in a company that PRANGE had introduced to him, this would result in a $2.5 million kickback to UA, of which $250,000 (ten percent) would go to PRANGE.  PRANGE agreed that this was "fair."

18.     Under his arrangement with UA, PRANGE introduced PERSON and her company, SBCO, to UA.  As will be described below, UA invested a total of $31,000 of Fund monies in SBCO, and received a $15,500 kickback from PERSON.

19.     Under his arrangement with UA, PRANGE introduced BERMAN and KRANITZ, and their company China WI-Max, to UA.  As will be described below, UA invested a total of

7

$32,000.01 of Fund monies in China WI-Max, and received a $16,000 kickback from BERMAN and KRANITZ.

20.     As a result of these introductions, and as agreed to by UA and PRANGE, UA sent PRANGE $3,150, representing 10% of the kickback amounts provided by PERSON and by BERMAN and KRANITZ.  On or about August 19, 2011, in accordance with wiring instructions provided by PRANGE, the FBI caused the $3,150 payment to be wired from a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies" to a corporate bank account outside of Massachusetts controlled by PRANGE.

21.     Under his arrangement with UA, PRANGE also introduced JORDAN and his company, Vida Life, to UA.  As will be described below, UA invested a total of $32,000 of Fund monies in Vida Life, and received a $16,000 kickback from JORDAN.

22.     As a result of this introduction, and as agreed to by UA and PRANGE, UA sent PRANGE $1,600, representing 10% of the kickback amount provided by JORDAN.  On or about September 16, 2011, and in accordance with wiring instructions provided by PRANGE, the FBI caused the $1,600 payment to be wired from a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies" to a corporate bank account outside of Massachusetts controlled by PRANGE.

*KAREN PERSON*

## SCHEME TO DEFRAUD

23.     Beginning in or about July 2011 through at least August 17, 2011, PERSON engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by secretly kicking back to UA fifty percent of Fund monies invested in her company SBCO.

## MANNER AND MEANS OF THE FRAUD

24.     On or about July 22, 2011, PERSON met with UA, PRANGE, and CW at the Boston Office to discuss a potential investment of the Fund's monies in SBCO in exchange for a fifty percent kickback to UA (the "July 22 PERSON Meeting"). The July 22 PERSON Meeting was recorded.

25.     At the July 22 PERSON Meeting, UA represented to PERSON that he was a representative of the Fund. UA told PERSON that he had investment discretion over some of the Fund's monies. UA said to PERSON that he wanted to make "side deals" utilizing the Fund's monies, and explained that he was prepared to invest Fund monies in exchange for a kickback to UA of fifty percent of the monies invested. UA further told PERSON that his Fund would not know about the kickback to him. PERSON responded that she knew all about the kickback "from the get-go" and she understood the arrangement.

26.     At the July 22 PERSON Meeting, UA also discussed the mechanics of the funding, informing PERSON that while he could commit to an investment of $5 million of the Fund's monies, with $2.5 million being kicked back to him, he did not want to invest the entire amount all at once. Therefore, UA told PERSON that he would invest the money over time, in "tranches" of increasing amounts.

9

27.     At the July 22 PERSON Meeting, UA further discussed with PERSON the mechanics of the kickback.  UA explained to PERSON that she would be sending the kickback to one or more "nominee compan[ies]" which he himself controlled.  UA discussed with PERSON that her company would enter into a "consulting agreement" with him, and that invoices would be issued.  UA also stated that he did not intend to actually provide any consulting, and that the consulting arrangement was a "prop."  PERSON stated that she "g[o]t it."

28.     On or about July 28, 2011, in accordance with wiring instructions provided by PERSON, the FBI caused $31,000 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank account outside of Massachusetts controlled by PERSON.  This wire transfer represented the first "tranche" of funding to SBCO.

29.     On or about August 5, 2011, PERSON caused an SBCO stock certificate representing the purchase by the Fund of 310,000 SBCO shares to be sent to the Boston Office by private, commercial interstate carrier.

30.     On or about August 11, 2011, PERSON caused $15,500 to be sent by interstate electronic wire transfer from a corporate bank account outside of Massachusetts controlled by her to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies."  This wire transfer represented PERSON's kickback to UA from the first "tranche" of funding to SBCO.

*STEVEN BERMAN AND RICHARD KRANITZ*

<u>SCHEME TO DEFRAUD</u>

31.     Beginning in or about July 2011 through at least September 8, 2011, BERMAN

and KRANITZ engaged in, or attempted to engage in, a scheme to defraud and obtain money and

property by secretly kicking back to UA fifty percent of Fund monies invested in China WI-Max.

<u>MANNER AND MEANS OF THE FRAUD</u>

32.     On or about July 13, 2011, BERMAN participated in a telephone call with

PRANGE and CW (the "July 13 BERMAN Call"). The July 13 BERMAN Call was recorded,

unbeknownst to BERMAN and PRANGE. CW knew of, and consented to, the recording.

33.     On the July 13 BERMAN Call, CW, PRANGE, and BERMAN discussed the

potential funding arrangement with UA. BERMAN was told that UA could invest up to $5

million of Fund monies in a given company. BERMAN was told that in order to receive funding,

he would need to pay a kickback of fifty percent of monies invested to UA—a kickback which

the Fund would know nothing about. CW told BERMAN that the kickback would get paid to a

nominee consulting company controlled by UA, although UA would not provide any consulting

services. CW told BERMAN that he considered the kickback arrangement to be "inappropriate"

and "illegal." BERMAN responded that he was not willing to do anything illegal, but stated that

he was not certain that such an arrangement would be illegal. BERMAN went on to state that "It

may be how you characterize it . . . I may be able to get some comfort with it. I don't want to say

no right here on the phone. I'm interested in pursuing this; if it's clearly illegal, I'm not

interested . . . But I think actually how we characterize it may be, uh, what side of the coin you're

looking at. Because I'm sensitive to that. I mean, we're, we're all sort of, uh, straight players on

11

the team here at China WI-Max." BERMAN asked CW to speak with KRANITZ so that

KRANITZ could provide feedback on the arrangement.

34.     Later in the day on or about July 13, 2011, KRANITZ spoke to CW and PRANGE

over the telephone to discuss the funding offered by UA (the "July 13 KRANITZ Call"). The

July 13 KRANITZ Call was recorded, unbeknownst to KRANITZ and PRANGE. CW knew of,

and consented to, the recording.

35.     In the July 13 KRANITZ Call, CW explained that UA was prepared to invest

Fund monies in exchange for a kickback to UA of fifty percent of the monies invested. During

the call, KRANITZ asked questions about the funding and, among other things, specifically

asked if the Fund would know about the "use of the proceeds" of the investment. CW told

KRANITZ that the Fund would know about the stock purchases, but would not know about the

fifty percent kickback to UA.

36.     Also on the July 13 KRANITZ Call, PRANGE asked whether all the kickback

payments were paid to the same nominee consulting company. CW told KRANITZ and

PRANGE that UA had different "nominee names" and that he would use different "nominee

names" to receive the kickback payments because it would be too "suspicious" if all of the

kickback payments were sent to one place.

37.     On or about July 22, 2011, BERMAN met with UA, PRANGE, and CW at the

Boston Office to discuss a potential investment of the Fund's monies in China WI-Max in

exchange for a fifty percent kickback to UA (the "July 22 BERMAN Meeting"). The July 22

BERMAN Meeting was recorded.

38.     At the July 22 BERMAN Meeting, UA represented to BERMAN that he was a representative of the Fund.  UA explained to BERMAN that he was prepared to invest Fund monies, of up to $5 million, in exchange for "fifty percent being kicked back to [UA] right off the top."  BERMAN indicated that he was aware of the kickback arrangement, and stated that "I'm OK with that.  As long as it's structured properly, and, and everyone's cool, I'm cool."  UA further told BERMAN that his Fund would not know about the "side deal" through which BERMAN would kick back monies to UA's "nominee company," and that therefore confidentiality was important.  BERMAN responded that ". . . that's the one thing where we need to talk to my guy, Rich Kranitz, who's entrepreneurial, not a stuffed shirt, uh, and figure out how we do this.  Because I can't lie, and I am, I'm a CEO of a public company, so the, the one hiccup is we need to figure out how we manage that so that you're comfortable and I'm comfortable.  And I'm sure there's a way to do it 'cause I talked to Rich about this beforehand and he said, 'Oh, we can— there's ways we can do this.'  But that's the, that's the one hiccup we have to [work] out."

39.     At the July 22 BERMAN Meeting, UA also discussed the mechanics of the funding, informing BERMAN that while he could commit to an investment of $5 million of the Fund's monies, with $2.5 million being kicked back to him, he did not want to invest the entire amount at once.  Therefore, UA told BERMAN that he would invest the money over time, in "tranches" of increasing amounts.

40.     At the July 22 BERMAN Meeting, UA further discussed with BERMAN the mechanics of how monies would be kicked back to UA.  UA discussed with BERMAN that BERMAN's company would enter into a "consulting agreement" with one of UA's "nominee

13

companies," even though UA said that he did not intend to provide any consulting. UA further stated that he would invoice BERMAN's company for those consulting services, which would "provide[] the paper trail, [and] cover everything." BERMAN indicated he was comfortable with that arrangement.

41.    On or about July 25, 2011, following the July 22 BERMAN Meeting, KRANITZ spoke to UA, BERMAN, and PRANGE over the telephone (the "July 25 KRANITZ Call"). The July 25 KRANITZ Call was recorded, unbeknownst to KRANITZ, BERMAN and PRANGE. UA knew of, and consented to, the recording.

42.    In the July 25 KRANITZ Call, BERMAN stated that KRANITZ would prepare the documentation for the kickback transaction and UA gave KRANITZ direction regarding the documentation needed to "paper" the transaction. Among other things, UA told KRANITZ to prepare both a stock purchase agreement with the Fund and a consulting agreement with one of UA's nominee consulting companies. UA told KRANITZ that, although he would sign the consulting agreement on behalf of his nominee company, KRANITZ should not put UA's name on the agreement because UA did not want his name in print. KRANITZ stated "that is perfect, I will do that."

43.    Also on the July 25, 2011 KRANITZ Call, BERMAN stated that UA was to be the only point of contact at the Fund because the transaction had to be kept confidential.

44.    Following the July 25, 2011 KRANITZ Call, and on various dates between July 26, 2011 and September 8, 2011, KRANITZ sent UA documents related to the kickback transaction, including a consulting agreement between China WI-Max and UA's nominee consulting company and stock purchase agreements between China WI-Max and the Fund.

14

45.    On or about July 28, 2011, in accordance with wiring instructions provided by a third person at the direction of KRANITZ, the FBI caused $32,000.01 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a China WI-Max corporate bank account outside of Massachusetts. This wire transfer represented the first "tranche" of funding to China WI-Max.

46.    On or about August 1, 2011, BERMAN and KRANITZ caused $16,000 to be sent by interstate electronic wire transfer from a China WI-Max corporate bank account outside of Massachusetts to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies." This wire transfer represented BERMAN's and KRANITZ's kickback to UA from the first "tranche" of funding to China WI-Max.

47.    On or about August 11, 2011, BERMAN and KRANITZ caused a China WI-Max stock certificate representing the purchase by the Fund of 1,066,667 China WI-Max shares to be sent to the Boston Office by United States mail.


*JOHN C. JORDAN*

## SCHEME TO DEFRAUD

48.    Beginning in or about August 2011 through at least September 18, 2011, JORDAN engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by secretly kicking back to UA fifty percent of Fund monies invested in Vida Life.

## MANNER AND MEANS OF THE FRAUD

49.    On or about August 22, 2011, JORDAN met with PRANGE and UA at the Boston Office to discuss a potential investment of the Fund's monies in Vida Life in exchange

15

for a fifty percent kickback to UA (the "August 22 JORDAN Meeting"). The August 22

JORDAN Meeting was recorded.

50.     At the August 22 JORDAN Meeting, UA represented to JORDAN that he was a

representative of the Fund. UA told JORDAN that he had investment discretion over some of

the Fund's monies. UA said to JORDAN that he was prepared to invest Fund monies in

exchange for a kickback to UA of fifty percent of the monies invested. UA further told

JORDAN that his Fund would not know about the kickback to him.

51.     At the August 22 JORDAN Meeting, UA also discussed the mechanics of the

funding, informing JORDAN that while he could commit to an investment of $5 million of the

Fund's monies, with a fifty percent (or $2.5 million) kickback to him, he did not want to invest

the entire amount all at once. Therefore, UA told JORDAN that he would invest the money over

time, in "tranches" of increasing amounts.

52.     At the August 22 JORDAN Meeting, UA further discussed with JORDAN the

mechanics of the kickback. UA explained to JORDAN that Vida Life would be sending the

kickback to a "nominee company" which he himself controlled. UA discussed with JORDAN

that Vida Life would enter into a "consulting agreement" with his "nominee company," even

though UA said that he did not intend to provide any consulting, and that invoices would be

issued by his "nominee company" in order to "mask" and "cover up" the kickback payments.

53.     At the August 22 JORDAN Meeting, and after the UA had discussed the kickback

transaction, JORDAN agreed to pay the kickback in exchange for funding to Vida Life.

JORDAN also executed a consulting agreement between Vida Life and the UA's nominee

company, which agreement JORDAN had prepared prior to the meeting. Thereafter, on various

16

dates between August 22, 2011 and September 18, 2011, JORDAN prepared other documents for

the kickback transaction, including a stock purchase agreement and bogus invoice for non-

existent consulting services.

54.     On or about August 29, 2011, in accordance with wiring instructions provided by

JORDAN, the FBI caused $32,000 to be sent by interstate electronic wire transfer from a covert

bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank

account outside of Massachusetts and controlled by JORDAN.  The wire transfer represented the

first "tranche" of funding to Vida Life.

55.     On or about September 2, 2011, JORDAN caused a total of $16,000 to be sent in

four wire transfers, at least one of which was sent from a corporate bank account outside of

Massachusetts to a covert bank account in Boston, Massachusetts, purportedly belonging to one

of UA's nominee companies.  These wire transfers represented JORDAN's kickback to UA from

the first "tranche" of funding to Vida Life.

56.     On or about September 7, 2011, JORDAN caused a stock certificate representing

the purchase by the Fund of 400,000 Vida Life shares to be sent to the Boston Office by private,

commercial interstate carrier.


*KELLY BLACK-WHITE*

## SCHEME TO DEFRAUD

57.     Beginning in or about May 6, 2011 through at least July 8, 2011 BLACK-WHITE

engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by

agreeing to introduce executives to UA who could enter into the funding/kickback arrangement

17

described above. BLACK-WHITE and UA agreed that for each such arrangement, BLACK-WHITE would receive a portion of the kickback.

## MANNER AND MEANS OF THE FRAUD

58.     On June 13, 2011, BLACK-WHITE met with UA and CW, who introduced BLACK-WHITE to UA (the "June 13 BLACK-WHITE Meeting"), at the Boston Office. The June 13 BLACK-WHITE Meeting was recorded.

59.     Prior to the June 13 BLACK-WHITE Meeting, CW had informed BLACK-WHITE that UA was a manager of an investment fund who was willing to invest money in companies in return for a fifty percent kickback that would go to UA. During the June 13 BLACK-WHITE Meeting, UA represented to BLACK-WHITE that he was a representative of the Fund who had investment discretion over some of the Fund's monies. UA reiterated to BLACK-WHITE that he was prepared to invest Fund monies in various companies in exchange for a kickback to UA of fifty percent of the monies invested. UA told BLACK-WHITE that his Fund would not know about the kickback to him.

60.     UA also discussed the mechanics of the funding, informing BLACK-WHITE that although he was willing to invest up to $5 million of the Fund's monies in a particular company, with $2.5 million being kicked back to him, he did not want to invest the entire amount all at once, so as to avoid detection by the Fund. Therefore, UA said that he would invest the money over time, in "tranches" of increasing amounts. UA also discussed with BLACK-WHITE that the kickback would be sent by a given company in which his Fund had invested to a "nominee company" which he himself controlled, and which his Fund did not know about. UA further

18

discussed with BLACK-WHITE the fact that invoices would be issued by his "nominee company" in order to "legitimize" the kickback amounts.

61.     As discussed during the June 13 BLACK-WHITE Meeting, BLACK-WHITE's role would be to find and introduce companies to UA. During the June 13 BLACK-WHITE Meeting, UA told BLACK-WHITE that she would receive a portion of each kickback he got from a company that she referred.

62.     Prior to the June 13 BLACK-WHITE Meeting, BLACK-WHITE had found and referred to UA at least two companies in which he might invest his Fund's monies in exchange for a kickback. Specifically, BLACK-WHITE referred Symbollon Pharmaceuticals, Inc. ("Symbollon") to UA. UA invested a total of $108,000 of Fund monies in Symbollon, and received a $54,000 kickback from Symbollon and its principal. BLACK-WHITE also referred MicroHoldings, Inc. ("MicroHoldings") to UA. UA invested a total of $48,000 of Fund monies in MicroHoldings and received a $24,000 kickback from MicroHoldings and its principal.

63.     Following the June 13 BLACK-WHITE Meeting, BLACK-WHITE found and introduced to UA at least four companies in which he might invest his Fund's monies in exchange for a kickback. Specifically, BLACK-WHITE introduced:

- STUART, and his company ComCam, to UA. As will be described below, UA invested a total of $34,000.20 in ComCam and received a $17,000 kickback from STUART and ComCam.

- REDA, and his company 1st Global, to UA. As will be described below, UA invested a total of $32,000 in 1st Global and received a $16,000 kickback from REDA and 1st Global.

19

- Oriens Travel & Hotel Management ("Oriens Travel") to UA.  UA invested a total of $16,000 of Fund monies in Oriens Travel, and received an $8,000 kickback from Oriens Travel and its principal.

- A5 Laboratories, Inc. ("A5") to UA.  UA invested a total of $15,000 of Fund monies in A5 and received a $7,500 kickback from A5 and its principal.

64.     As a result of these introductions, and as agreed to by UA and BLACK-WHITE, UA sent BLACK-WHITE a total of $6,050, representing a portion of the kickback amounts provided by the principals of Symbollon, MicroHoldings, Oriens Travel and A5.

65.     On or about June 22, 2011, in accordance with wiring instructions provided by BLACK-WHITE, the FBI caused a $4,500 payment to be wired from a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies" to a corporate bank account outside of Massachusetts controlled by BLACK-WHITE.  The $4,500 represented BLACK-WHITE's share of the fifty percent kickback received by UA after he had invested the Fund's monies in Symbollon and MicroHoldings, in accordance with the agreement reached during the June 13 BLACK-WHITE Meeting.

66.     On July 5, 2011, pursuant to wiring instructions provided by BLACK-WHITE, the FBI caused a $1,550 payment to be wired from a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's "nominee companies" to a corporate bank account outside of Massachusetts controlled by BLACK-WHITE.  The $1,550 represented BLACK-WHITE's share of the fifty percent kickback received by UA after he had invested the Fund's monies in Oriens Travel and A5, in accordance with the agreement reached during the June 13 BLACK-WHITE Meeting.

20

*STEVEN STUART*

## SCHEME TO DEFRAUD

67.     Beginning in or about June 2011 through at least August 12, 2011, STUART

engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by

secretly kicking back to UA fifty percent of Fund monies invested in ComCam.

## MANNER AND MEANS OF THE FRAUD

68.     On or about June 27, 2011, STUART spoke to CW and another individual, P.I.,

who is the President of ComCam, over the telephone to discuss the funding offered by UA ("June

27 STUART Call"). The June 27 STUART Call was recorded, unbeknownst to STUART and

P.I. CW knew of, and consented to, the recording.

69.     In the June 27 STUART Call, CW explained that UA was prepared to invest Fund

monies in exchange for a kickback to UA of fifty percent of the monies invested. Among other

things, CW explained that the Fund was not aware of the kickback and that UA would invest the

money over time, in "tranches" of increasing amounts. When STUART asked why UA would

not invest the full amount all at once, CW explained that these types of transactions "are not

legitimate" and that UA had to "slip" the investments in with the "legitimate transactions."

70.     In the June 27 STUART Call, P.I. noted that the proposed investment was "not a

fully legal transaction from an SEC perspective" and wondered what kind of trouble they could

get in for engaging in the kickback transaction.

71.     On or about June 29, 2011, STUART met with UA, CW, and another individual,

D.G., who was the Chairman of ComCam, at the Boston Office to discuss a potential investment

21

of the Fund's monies in ComCam in exchange for a fifty percent kickback to UA (the "June 29

STUART Meeting"). The June 29 STUART Meeting was recorded.

72.     At that June 29 STUART Meeting, UA represented to STUART that he was a

representative of the Fund. UA told STUART that he had investment discretion over some of the

Fund's monies. UA said to STUART that he was prepared to invest Fund monies in exchange

for a kickback to UA of fifty percent of the monies invested. UA further told STUART that his

Fund would not know about the kickback to him.

73.     At the June 29 STUART Meeting, UA also discussed the mechanics of the

funding, informing STUART that while he could commit to an investment of $5 million of the

Fund's monies, with $2.5 million "kicked back" to him, he did not want to invest the entire

amount all at once, so as to avoid detection by the Fund. Therefore, UA told STUART that he

would invest the money over time, in "tranches" of increasing amounts.

74.     At the June 29 STUART Meeting, UA further discussed with STUART the

mechanics of the kickback. UA explained to STUART that ComCam would be sending the

kickback to one or more "nominee companies" which he himself controlled. UA discussed with

STUART that ComCam would enter into a "consulting agreement" with his "nominee

company," even though UA said that he did not intend to provide any consulting, and that

invoices would be issued by his "nominee company" in order to hide the kickback payments.

75.     At the June 29 STUART Meeting, after UA had discussed the kickback

transaction, STUART and D.G. agreed to pay the kickback in exchange for funding to ComCam.

STUART then directed D.G. to prepare the documents for the transaction, including a consulting

agreement between ComCam and one of UA's nominee consulting companies.

76.     On or about July 5, 2011, in accordance with wiring instructions provided by D.G., the FBI caused $34,000.20 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to ComCam's corporate bank account held outside of Massachusetts. The wire transfer represented the first "tranche" of funding to ComCam.

77.     On or about July 6, 2011, STUART and D.G. caused $17,000 to be sent by interstate wire transfer from ComCam's corporate bank account outside of Massachusetts to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's nominee companies. This wire transfer represented ComCam's kickback to UA from the first "tranche" of funding to ComCam.

78.     On or about July 8, 2011, a stock transfer agent sent a stock certificate to UA by private, commercial interstate carrier. The certificate reflected the Fund's ownership of 65,385 shares of ComCam's common stock.

79.     Thereafter, on at least two occasions in July 2011, STUART sent emails to UA inquiring about additional tranches of funding.


*ALBERT REDA*

## SCHEME TO DEFRAUD

80.     Beginning in or about June 2011 through at least July 22, 2011, REDA engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by secretly kicking back to UA fifty percent of Fund monies invested in 1st Global.

23

## MANNER AND MEANS OF THE FRAUD

81.     On or about June 29, 2011, REDA met with UA and CW at the Boston Office to discuss a potential investment of the Fund's monies in 1st Global in exchange for a fifty percent kickback to UA (the "June 29 REDA Meeting"). The June 29 REDA Meeting was recorded.

82.     At that June 29 REDA Meeting, UA represented to REDA that he was a representative of the Fund. UA told REDA that he had investment discretion over some of the Fund's monies. UA said to REDA that he was prepared to invest Fund monies in exchange for a kickback to UA of fifty percent of the monies invested. UA further told REDA that his Fund would not know about the kickback to him.

83.     At the June 29 REDA Meeting, UA also discussed the mechanics of the funding, informing REDA that while he could commit to an investment of $5 million of the Fund's monies, with fifty percent (or $2.5 million) "kicked back" to him, he did not want to invest the entire amount all at once, so as to avoid detection by the Fund. Therefore, UA told REDA that he would invest the money over time, in "tranches" of increasing amounts.

84.     At the June 29 REDA Meeting, UA further discussed with REDA the mechanics of the kickback. UA explained to REDA that 1st Global would be sending the kickback to one or more "nominee companies" which he himself controlled. UA discussed with REDA that 1st Global would enter into "consulting agreements" with one of his "nominee companies," even though UA said that he did not intend to provide any consulting, and that invoices would be issued by his "nominee companies" in order to "legitimize" the kickback payments.

85.     At the June 29 REDA Meeting, after UA had discussed the kickback transaction, REDA agreed to pay the kickback in exchange for funding to 1st Global. Thereafter, REDA

24

prepared the documents for the transaction, including a consulting agreement with one of UA's "nominee companies," which documents REDA sent to UA via e-mail.

86.     On or about July 5, 2011, in accordance with wiring instructions provided by REDA, the FBI caused $32,000 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank account held outside of Massachusetts and controlled by REDA. The wire transfer represented the first "tranche" of funding to 1st Global.

87.     On or about July 5, 2011, REDA caused a stock certificate representing the purchase by the Fund of 320,000 1st Global shares to be sent to the Boston Office by private, commercial interstate carrier.

88.     On or about July 6, 2011, REDA caused $16,000 to be sent by interstate wire transfer from 1st Global's corporate bank account outside of Massachusetts to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's nominee companies. This wire transfer represented 1st Global's kickback to UA from the first "tranche" of funding to 1st Global.

*MUHAMMAD "M.J." SHAHEED*

<u>SCHEME TO DEFRAUD</u>

89.     Beginning in or about November 2010 through at least April 1, 2011, SHAHEED engaged in, or attempted to engage in, a scheme to defraud and obtain money and property by secretly kicking back to UA fifty percent of Fund monies invested in his company Augrid.

## MANNER AND MEANS OF THE FRAUD

90.     On or about November 23, 2010, SHAHEED met with UA and a third individual

at the Boston Office to discuss a potential investment of the Fund's monies in Augrid in

exchange for a fifty percent kickback to UA (the "November 23 SHAHEED Meeting"). The

November 23 SHAHEED Meeting was recorded.

91.     At the November 23 SHAHEED Meeting, UA represented to SHAHEED that he

was a representative of the Fund. UA informed SHAHEED that he had investment discretion for

a certain percentage of the Fund's monies. UA noted that, due to his position, he had a fiduciary

duty to the Fund's investors. UA said to SHAHEED that he was willing to enter into "backdoor"

deals utilizing the Fund's monies, explaining that he was prepared to invest Fund monies in

SHAHEED's company in exchange for a kickback to UA of fifty percent of the monies invested.

92.     At the November 23 SHAHEED Meeting, UA discussed the mechanics of the

funding of SHAHEED's company, informing SHAHEED that UA would begin by investing

smaller amounts in SHAHEED's company, while planning to increase the amounts in the future.

UA further discussed with SHAHEED the mechanics of the kickback to UA. UA explained to

SHAHEED that SHAHEED would be sending the kickback to one or more companies which UA

himself controlled. UA discussed with SHAHEED that Augrid would enter into a "consulting

agreement" with one or more of UA's companies, and, under such an agreement, SHAHEED

would pay the relevant company owned by UA an amount equaling the fifty percent kickback of

Fund monies invested in Augrid. UA further indicated to SHAHEED that the Fund would not

know about the kickback paid to him through such "consulting agreements." SHAHEED

26

indicated that he was comfortable with the kickback arrangement and was prepared to go forward with it.

93.     On or about December 1, 2010, in accordance with wiring instructions provided by SHAHEED, the FBI caused $10,000 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank account outside of Massachusetts controlled by SHAHEED.  This wire transfer represented the first tranche of funding to Augrid.

94.     On or about December 2, 2010, SHAHEED caused $5,000 to be sent by interstate electronic wire transfer from a corporate bank account outside of Massachusetts and controlled by him to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's nominee companies.  This wire transfer represented SHAHEED's kickback to UA from the first tranche of funding to Augrid.

95.     On or about December 3, 2010, SHAHEED caused an Augrid stock certificate representing the purchase by the Fund of 1,000,000 Augrid shares to be sent to the Boston Office by private, commercial interstate carrier.

96.     On or about December 9, 2010, in accordance with wiring instructions provided by SHAHEED, the FBI caused $20,000 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank account outside of Massachusetts controlled by SHAHEED.  This wire transfer represented the second tranche of funding to Augrid.

97.     On or about December 10, 2010, SHAHEED caused $10,000 to be sent by interstate electronic wire transfer from a corporate bank account outside of Massachusetts and

controlled by him to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's nominee companies. This wire transfer represented SHAHEED's kickback to UA from the second tranche of funding to Augrid.

98.     On or about December 10, 2010, SHAHEED caused an Augrid stock certificate representing the purchase by the Fund of 1,000,000 Augrid shares to be sent to the Boston Office by private, commercial interstate carrier.

99.     On or about January 10, 2011, in accordance with wiring instructions provided by SHAHEED, the FBI caused $30,000 to be sent by interstate electronic wire transfer from a covert bank account in Boston, Massachusetts, purportedly belonging to the Fund, to a corporate bank account outside of Massachusetts controlled by SHAHEED. This wire transfer represented the third tranche of funding to Augrid.

100.    On or about January 11, 2011, SHAHEED caused $15,000 to be sent by interstate electronic wire transfer from a corporate bank account outside of Massachusetts and controlled by him to a covert bank account in Boston, Massachusetts, purportedly belonging to one of UA's nominee companies. This wire transfer represented SHAHEED's kickback to UA from the third tranche of funding to Augrid.

101.    On or about January 21, 2011, SHAHEED caused an Augrid stock certificate representing the purchase by the Fund of 1,500,000 Augrid shares to be sent to the Boston Office by private, commercial interstate carrier.

## CONCLUSION

102.    Based on the foregoing, I have probable cause to believe that James PRANGE, Karen PERSON, Steven BERMAN, Richard KRANITZ, John C. JORDAN, Kelly BLACK-

WHITE, Stephen STUART, Albert REDA, and Muhammad "M.J." SHAHEED all devised and intended to devise a scheme and artifice to defraud, and obtained money and property by means of material false and fraudulent pretenses, representations, and promises and did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, and attempted to do so, in violation of Title 18, United States Code, Sections 1343, 1349 and 2.

103.     Based on the foregoing, I have probable cause to believe that Karen PERSON, Steven BERMAN, Richard KRANITZ, John C. JORDAN, Stephen STUART, Albert REDA, and Muhammad "M.J." SHAHEED all devised and intended to devise a scheme and artifice to defraud, and obtained money and property by means of material false and fraudulent pretenses, representations, and promises and did cause things to be delivered by mail, or private or interstate commercial carrier, for the purpose of executing such scheme and artifice, and attempted to do so, in violation of Title 18, United States Code, Sections 1341 and 2.

29

I hereby certify that the foregoing is true and correct.  Executed this 30th day of November, 2011.

Chris Gianakura
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 30th day of November, 2011.

Honorable Leo T. Sorokin
UNITED STATES MAGISTRATE JUDGE

30

%JS 45  (5/97) - (Revised U.S.D.C. MA 3/25/2011)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

Place of Offense:                 Category No. __II__          Investigating Agency __FBI__

City   **Burlington**

County  **Middlesex**          Related Case Information:

Superseding Ind./ Inf. _____ Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  **Steven Berman**          Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:  ☑ Yes  ☐ No

Alias Name

Address    (City & State)  **Hillsboro, OH**                          ☐

Birth date (Yr only): 1962  SSN (last4#): **6460**  Sex **M**   Race: **White**   Nationality: **USA**

Defense Counsel if known:   **Martin F. Murphy**      Address **Foley Hoag LLP**

Bar Number   _____                    **155 Seaport Boulevard**

                                               **Boston, MA 02210**

**U.S. Attorney Information:**

AUSA   **Vassili Thomadakis/Sarah Walters**      Bar Number if applicable _____

Interpreter:    ☐ Yes  ☑ No          List language and/or dialect: _____

Victims:    ☐ Yes ☑ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)  ☐ Yes  ☐ No

Matter to be SEALED:   ☑ Yes   ☐ No

    ☑ Warrant Requested        ☐ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____
☐ Already in State Custody at _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

Charging Document:   ☑ Complaint    ☐ Information        ☐ Indictment

Total # of Counts:    ☐ Petty ——— ☐ Misdemeanor ——— ☑ Felony  **2**

Continue on Page 2 for Entry of U.S.C. Citations

☑   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: **November 30, 2011**      Signature of AUSA: _____

JS 45 (5/97) (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**   Steven Berman

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. §§ 1343, 1349, 2 | Wire fraud (attempt) | |
| Set 2 | 18 U.S.C. §§ 1341, 2 | Mail fraud (attempt) | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____

cr js-45-MA2011.wpd - 3/25/2011